## IN THE COURT OF APPEALS OF TENNESSEE,
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **TIRE SHREDDERS, INC.**, | ) | Shelby County Circuit Court |
|  | ) | No. 55451-2 |
| Plaintiff/Appellee. | ) |  |
|  | ) |  |
| VS. | ) | C.A. No. 02A01-9803-CV-00058 |
|  | ) |  |
| **ERM-NORTH CENTRAL, INC. and** | ) |  |
| **ERM-EVIRONCLEAN-NORTH** | ) |  |
| **CENTRAL, INC.**, | ) |  |
|  | ) |  |
| Defendants/Appellants. | ) |  |
|  | ) |  |

**FILED**

**August 30, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

_____

From the Circuit Court of Shelby County at Memphis.
**Honorable James F. Russell, Judge**

**Leo Bearman, Jr.**,
**Bradley E. Trammell**,
BAKER, DONELSON, BEARMAN & CALDWELL, Memphis, Tennessee
**John E. Quinn**,
MANIER & HEROD, Nashville, Tennessee
Attorneys for Defendants/Appellants.

**John D. Richardson**,
**Teresa A. Newsom**,
THE RICHARDSON LAW FIRM, Memphis, Tennessee
**Roger Stone**,
STONE, HIGGS & DREXLER, Memphis, Tennessee
Attorneys for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**HIGHERS, J.**: (Concurs)
**TOMLIN, Sp. J.**: (Concurs)

Defendants ERM-North Central and ERM-Enviroclean-North Central (collectively "ERM") appeal from a jury verdict requiring ERM to pay $1,300,000.00 as damages to Plaintiff Tire Shredders, Inc. ("TSI") for the negligent destruction of a shredding machine owned by TSI. For the reasons set forth below, we uphold the jury verdict and affirm the challenged evidentiary rulings of the trial court.

### *Factual and Procedural History*

ERM entered into a contract with Nissan Industrial Equipment Company ("Nissan") under which ERM agreed to destroy and dispose of some fiberglass boats at Nissan's facility in Memphis. ERM then entered into subcontracts with American Maintenance, Inc. ("AMI"), Mid-Town Auto Parts and Crushers, Inc. ("Mid-Town"), Floied Fire Extinguisher and Steam Cleaning Company, Inc. ("Floied"), Keating Environmental Management, Inc., Daniel T. Keating Company a.k.a. Daniel J. Keating Construction Company, Daniel J. Keating Company, or Daniel T. Keating Construction Company (collectively "Keating"), and TSI. Under these subcontracts, AMI agreed to provide general labor and clean-up, Mid-Town agreed to crush the boats, Floied agreed to provide two heavy-duty 150-pound fire extinguishers, Keating agreed to provide supervisory personnel, and TSI agreed to provide a shredding machine[1] and personnel to operate the machine. TSI shipped its shredding machine to the Nissan facility in Memphis and began performing under its subcontract with ERM. The Nissan project was scheduled to last approximately four weeks. On the thirteenth day of the project, however, a fire occurred at the Nissan facility that completely destroyed TSI's shredding machine.

As a result of this fire, three separate lawsuits were filed in the Circuit Court of Shelby County. These related actions were subsequently transferred to a single division of that court and consolidated prior to trial. We discuss the procedural histories of these actions separately.

In the first lawsuit, TSI filed a products liability action against Mac Saturn. TSI took an unconditional non-suit with respect to its claim against Mac Saturn in October of 1997.

---

[1]TSI's shredding machine was designed and manufactured by Mac Corporation of America and Saturn Shredder Manufacturing Corporation (collectively "Mac Saturn").

In the second lawsuit, Nissan filed a negligence action against TSI, AMI, ERM, Mid-Town, and Mac Saturn. The parties ultimately reached a settlement with respect to Nissan's claims against TSI, AMI, ERM, Mid-Town, and Mac Saturn. Consequently, in July of 1997, the trial court entered a consent order dismissing this action with prejudice.

In the third lawsuit, which is the subject of the present appeal, TSI filed a negligence action against ERM, Mid-Town, Floied, and AMI. ERM filed an answer to TSI's complaint and asserted a cross-claim against Mid-Town and AMI. Additionally, Floied filed an answer to TSI's complaint, a third party complaint against Nissan, and a cross-claim against ERM, Mid-Town, and AMI. TSI subsequently amended its complaint to add Keating as an additional defendant. Nissan then filed an answer to Floied's third party complaint and a counter-claim against Floied. In November of 1995, after receiving notices of voluntary dismissal or non-suit, the trial court dismissed without prejudice TSI's claim and ERM's cross-claim against Mid-Town. Thereafter in September of 1997, TSI took a voluntary non-suit with respect to its claims against AMI, Floied, and Mac Saturn, leaving only ERM and Keating as defendants. After a trial on TSI's claims against ERM and Keating, the jury found that TSI had sustained a total of $1,300,000.00 in damages and that ERM was 100% responsible for these damages. ERM subsequently filed a motion to set aside the jury verdict or, in the alternative, for a new trial. The trial court denied ERM's post trial motion. This appeal followed.

*Issues and Standard of Review*

The issues raised on appeal, as stated by ERM, are as follows:

1. Whether the trial court erred in charging the jury that it could award "loss of use" or "lost profits" in addition to diminution in fair market value for the total destruction of a piece of personal property due to the negligence of a defendant.

2. Whether the trial court erred in its jury instruction as to loss of use.

3. Whether the trial court further erred by instructing the jury that it could award lost profits, since these "profits" were uncertain and speculative.

4. Whether the trial court erred by prohibiting the use of Plaintiff's pleadings and deposition testimony to cross-examine Robin Pointer, President of Tire Shredders, Inc.

5. Whether the trial court erred by refusing to admit trade journals as substantive evidence and further erred by refusing to permit their use in the cross-examination of Ms. Pointer to prove that Plaintiff did not mitigate its damages.

6. Whether the trial court erred by admitting Exhibit 24, an assortment of documents from an unnamed source, collectively into evidence.

7. Whether the trial court erred in refusing to admit damaging testimony regarding Niagara's business practices which showed the speculative nature of Plaintiff's alleged contract with Niagara.

8. Whether the trial court erred in allowing Jack Irwin to testify as an expert witness about Plaintiff's machine even though he was not qualified to do so.

9. Whether the trial court erred by excluding testimony from the Fire Investigator as to the cause and origin of this fire.

Each of these issues involves a question of law. Thus, our review of the trial court's rulings with respect to these issues is *de novo* with no presumption of correctness. *See, e.g., Bell v. Icard, Merrill, Cullis, Timm, Furen and Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999); T.R.A.P. 13(d).

### Lost Profits and Loss of Use

By motion in limine, counsel for ERM requested that the trial court exclude any evidence regarding profits that TSI might have lost as a result of the destruction of its shredding machine. The trial court denied this request and allowed the jury to hear evidence of lost profits. At the conclusion of the proof, the trial court instructed the jury in pertinent part as follows:

In addition [to diminution in value], if you find for the plaintiff, you may award in your discretion one of the following types of damages: One, the loss of use of the tire shredder; or two, lost profits that the tire shredder would have produced. These terms shall be defined for you shortly. You may not award both loss of use and lost profits.

There are two important legal principles of which you should be aware in considering the plaintiff's claim for lost profits: First, a person whose property has been damaged by the wrongful act of another is bound to use reasonable care to avoid loss and to minimize damages. A party may not recover for losses that could have been prevented by reasonable efforts or by expenditures that might reasonably have been made; second, plaintiff cannot recover lost profits if the amount is uncertain, contingent or speculative. Only in a clear case where the proof of profits is devoid of any element of speculation and shows all proper means taken to minimize loss should a recovery be allowed for lost profits.

Plaintiff's efforts to minimize its damages by finding substitute equipment to perform its contract must be reasonable under the circumstances. If a substitute shredder similar to the one destroyed in the 1990 fire was unavailable, you must consider whether the plaintiff made a reasonable and sufficient effort to find different equipment which would allow it to perform its contract with Niagara Recycling & Manufacturing.

The plaintiff is allowed a recovery for those profits which were lost during the time reasonably needed to replace the property which has been used to produce profits and has been destroyed. Lost profits will be allowed as damages only if the wrongful act of the defendants caused the loss. There may be recovery if the plaintiff has shown that a loss in profits is the natural and probable consequence or proximate result of the defendants' negligence.

Lost profits are allowed if the loss is proved with a reasonable degree of certainty. The law does not require that lost profits be proven with absolute certainty, but only with such reasonable certainty that damages may not be based wholly upon speculation and conjecture. While the testimony need not be sufficient to put the amount beyond doubt, it must be sufficient to enable you to make a fair and reasonable finding regarding the amount of lost profits. It is sufficient if there is a certain standard, fixed method by which profits sought to be recovered may be estimated and determined with a fair degree of accuracy. This does not imply that the lost profits must be determined to a mathematical certainty.

The measure of damages for loss of use is reasonable compensation to the plaintiff for being deprived of the use of the property during the time reasonably necessary for a reasonably prudent person to replace the property. In determining this amount you may consider the reasonable rental cost of the property for that period of time and the use or lack of use the plaintiff would have made of it except for the incident.

The jury ultimately found that TSI had sustained damages totaling $1,300,000.00. The parties had previously stipulated that, as a result of the fire, the value of TSI's shredding machine was diminished by $183,000.00. Thus, the amount of the jury's verdict encompassed a total of $1,117,000.00 in damages for lost profits or loss of use. ERM argues on appeal that the trial court erred in permitting the jury to award damages based on lost profits or loss of use.

There are a number of cases in Tennessee discussing the types of damages that are available when negligent conduct results in injury to personal property. In the first of these cases, *Johnson v. Perry*, 21 Tenn. (2 Hum.) 569 (Tenn. 1841), the defendants were involved in an altercation with the plaintiff's slave. *See id.* at 571. In attempting to escape from the defendants, the slave fell and broke his leg. *See id.* The court held that, if the injury had been temporary, the plaintiff could recover damages for the loss of the slave's service. *See id.* at 572. If, however, the slave had been permanently injured, the plaintiff could recover damages for the deteriorated value of the slave in lieu of damages for loss of service. *See id.* Finally, if he had been killed, the plaintiff would have been entitled to damages equal to the actual value of the slave but would not have been entitled to recover damages for loss of the slave's service. *See id.* In *Perkins v. Brown*, 177 S.W. 1158 (Tenn. 1915), the parties were involved in an automobile collision caused by the negligence of the defendant's driver. *See id.* at 1159. The court commented that "the owner of a vehicle held for use may recover for the loss of its use, by reason of tortious injury, while being repaired, in addition to the cost of the necessary repairs." *Id.* (citations omitted). In *Anderson v. Innman*, 3 Tenn. App. 195 (Tenn. App. 1926), which also involved an automobile accident, the court explained as follows:

> Before the advent of the automobile the rule in Tennessee in reference to personal property was, that the damage was measured by the market value immediately prior to the accident or injury, [r]educed by the value immediately after the accident or injury. . . .
>
> But where the injury is capable of being repaired, our court has recognized the method of ascertaining the damage by proof of the cost of the value of the repairs, plus the loss of use pending repair.

*Id.* at 197-98 (citations omitted). In another case involving an automobile accident, *Smith v. Fisher*, 11 Tenn. App. 273 (Tenn. App. 1929), the trial court instructed the jury that it could award damages for the loss of use of the plaintiff's vehicle during the time reasonably required to repair the vehicle. *See id.* at 296. Rather than repairing his vehicle, however, the plaintiff had elected to purchase a new vehicle and use his damaged vehicle as a "trade in." *See id.* at 299-300. Thus, because the plaintiff's vehicle was not actually repaired, the appellate court held that loss of use should not have been considered when measuring the plaintiff's damages. *See id.* at 300. Similarly, in *Yazoo & M. V. R. Co. v. Williams*, 185 S.W.2d 527 (Tenn. 1945), the plaintiff's truck was damaged in a collision

with the defendant's train. *See id.* at 528. The trial court instructed the jury that, if it found in favor of the plaintiff, the measure of damages was the cost of repairing the truck plus the value of the use of the truck during the period of time that would reasonably be required to obtain the necessary repairs. *See id.* at 529. After noting that the truck had not been repaired, the appellate court reversed, holding that the proper measure of damages was the difference between the value of the plaintiff's truck before the accident and its value after the accident. *See id.* at 530. In *American Bldgs. Co. v. DBH Attachments, Inc.*, 676 S.W.2d 558 (Tenn. App. 1984), the defendant negligently designed a roof that was erected onto the plaintiff's building. *See id.* at 561. Consequently, the plaintiff was forced to delay its occupancy of the building. *See id.* The court held that the plaintiff was entitled to recover lost profits resulting from this delay. *See id.* Because the court disagreed with the trial court's calculation of the plaintiff's lost profits, however, it modified the amount awarded by the trial court. *See id.* at 567. In *Corporate Air Fleet of Tennessee, Inc. v. Gates Learjet, Inc.*, 589 F. Supp. 1076 (M.D. Tenn. 1984), the plaintiff's jet crashed while landing, causing the jet to be out of service for approximately eleven months. *See id.* at 1078. In an action filed by the plaintiff in federal court against the manufacturer of the jet, the court held that "the plaintiff may recover damages for the loss of use of its aircraft due to the negligence of the defendant based upon the reasonable rental value of a substitute aircraft; however, such a recovery is limited to the time in which a substitute plane was actually rented." *Id.* at 1082 (citations omitted). Finally, in *Bickers v. Chrysler Motor Credit Corp.*, No. 6526, 1991 WL 18681 (Tenn. App. Feb. 20, 1991), the plaintiff's truck was dented while in the custody of the defendant. *See id.* at *1. Although the plaintiff testified that the value of the truck was diminished by $1,500.00 while in the defendant's custody, the trial court awarded the plaintiff only $250.00. *See id.* at *2. The appellate court affirmed, noting that, if the plaintiff's property is capable of being repaired, the measure of damages is the cost of repair plus loss of use, rather that the diminution in value of the property. *See id.* at *3.

The rules set forth in the aforementioned cases are consistent with the Tennessee Pattern Jury Instructions regarding damage to personal property. These instructions provide in pertinent part as follows:

The measure of damage to personal property is as follows:

> If the damages have been repaired or the property is capable of repair so that the three factors of function, appearance, and value have been or will be restored to substantially the same value as before the incident, then the measure of damages is the reasonable cost of repairs necessary for the restoration plus any loss of use pending the repairs.

> If [the damages have not been repaired][the property is not capable of repair] so as to restore function, appearance, and value as they were immediately before the incident, then the measure of damages is the difference in the fair market value of the property immediately before the incident and immediately after the incident.

T.P.I. 3—CIVIL 14.40.

> The measure of damages for loss of use is reasonable compensation to the plaintiff for being deprived of the use of the [automobile][property] during the time reasonably necessary for repair of the damage caused by the incident. In determining this amount, you may consider the reasonable rental cost of an [automobile][property] for that period of time and the use or lack of use the plaintiff would have made of it except for the incident.

T.P.I. 3—CIVIL 14.43. The parties in the instant case have stipulated that TSI's shredding machine was completely destroyed in the fire that occurred at the Nissan facility. ERM therefore asserts that, under Tennessee Pattern Jury Instruction 14.40, the proper measure of damages is the difference in the fair market value of the shredding machine immediately before the incident and immediately after the incident.[2]

We agree that, under the general rule as set forth in Tennessee Pattern Jury Instruction 14.40, lost profits are not recoverable when the plaintiff's personal property has been completely destroyed and is not capable of being repaired. TSI contends, however, that there is an exception to this rule when the destroyed property is commercial property that cannot be replaced within a reasonable period of time after the injury.[3] Although there are no reported cases in Tennessee specifically addressing whether such an exception exists, there is dicta in Tennessee cases that

---

[2]As stated above, the parties have stipulated that this value is $183,000.00.

[3]Several other jurisdictions have previously recognized the right of an owner of destroyed property to recover loss of use during the period of time that the owner is unable to replace the property. *See* C.C. Marvel, Annotation, ***Recovery For Loss of Use of Motor Vehicle Damaged or Destroyed***, 18 A.L.R.3d 497, § 9 (1968 & Supp. 1999)(citing twenty-seven cases from fifteen jurisdictions recognizing such an exception).

supports TSI's position.  For example, the court in *Fisher* stated as follows:

> There are cases involving the total destruction of commercial vehicles wherein damages for the loss of use are properly allowable; such, for example, as the case of [***Louisville & I. R. Co. v. Schuester***, 209 S.W. 542 (Ky. 1919)], wherein the court said: "Here the plaintiff was operating his truck daily as a common carrier over a scheduled route, and, until he could replace it, he had either to rent another or abandon his business; and the rental value of the use of a truck until a new one could be provided was of easy and accurate ascertainment, as was also the value of the truck at the time and place of its destruction.  The loss of the use was the approximate and natural result of its destruction, and having been pleaded as special damages, was a proper element of compensatory damages.  As stated in Sedgwick on Damages, Vol. 2, (9 Ed.), sec. 436, '. . . where, however, the property was actually in use at the time it was destroyed, the plaintiff may recover compensation for the damage caused by loss of it, up to the time when he could replace it.'"

*Fisher*, 11 Tenn. App. at 299.  Additionally, in *Walgreen Co. v. Walton*, 64 S.W.2d 44 (Tenn. App. 1932), which involved the wrongful eviction of the plaintiff by the defendant, the court commented that "whatever may be the rule in actions upon contract, we think a more liberal rule in regard to damages for profits lost, should prevail in actions purely of tort (excepting perhaps the action of trover)."  *Id.* at 51.  Finally, in *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W.2d 207 (Tenn. App. 1988), the court stated as follows:

> Damages for conversion of a vehicle are comparable to damages for loss or loss of a vehicle by negligence as in a collision.  In such cases, the rule is that, where no other vehicle is available, lost profits may be recovered if proved with certainty, but an award of lost profits is erroneous in the absence of a showing that no other vehicle could be had.  There is no evidence of the unavailability of another vehicle except lack of funds which is not recognized as an exception to the duty to mitigate damages by obtaining another vehicle.

*Id.* at 213 (citing 25 C.J.S. *Damages* § 83 (1966)).

The state of the law in Tennessee regarding loss of use or lost profits is summarized in Tennessee Law of Damages as follows:

> The Tennessee authorities appear to limit the recovery for loss of use to those instances where damages are measured by the repair rule and not by the diminution in value rule.  However, that issue has

never been conclusively decided by any Tennessee court and there is considerable logic to the contrary. In fact, the Court of Appeals has recognized the logic of a recovery of loss of use until a commercial vehicle can be replaced while rejecting the recovery when there was "no evidence that plaintiff could not have bought a new car promptly after the accident . . . ." Permitting the recovery for loss of use during a period necessary to replace an injured or destroyed chattel would be consistent with Tennessee decisions in contract cases involving loss of use.

Mayo L. Coiner, Tennessee Law of Damages § 6-4 (1988)(footnotes omitted). We agree that, under the unique circumstances of the instant case, there is logic in the position asserted by TSI. TSI's shredding machine was a piece of commercial property that, at the time of its destruction, was actually being used for profit. After the fire, Robin Pointer, the president of TSI, attempted to locate a suitable replacement shredding machine so that TSI could complete its subcontract with ERM and perform under its contract with Niagara.[4] These attempts were unsuccessful, however, causing TSI to lose profits from both the Nissan project and the Niagara project. Ms. Pointer estimated that it would take her a minimum of six to seven months to obtain a new shredding machine to replace the one that was destroyed in the fire. Thus, a shredding machine is unlike other types of personal property that can be replaced within a relatively short period of time. Given this lack of availability, it would be unfair not to allow TSI to recover the profits that were lost as a result of the negligent destruction of its shredding machine. Consequently, we recognize an exception to the general rule set forth in Tennessee Pattern Jury Instruction 14.40 and hold that, if the plaintiff's personal property has been completely destroyed by the negligence of the defendant and cannot be replaced within a reasonable period of time, the plaintiff may recover damages from the defendant for the loss of use of the property or for profits lost as a result of the destruction of the property.

The trial court instructed the jury that "[t]he measure of damages for loss of use is reasonable compensation to the plaintiff for being deprived of the use of the property during the time reasonably necessary for a reasonably prudent person *to replace* the property." Tennessee Pattern Jury Instruction 14.43 provides that "[t]he measure of damages for loss of use is reasonable compensation to the plaintiff for being deprived of the use of the [automobile] [property] during the time reasonably necessary *for repair* of the damage caused by the incident." T.P.I.—CIVIL 14.43

---

[4]TSI had previously entered into a contract with Niagara under which TSI agreed to shred asphalt roofing materials for Niagara after the completion of the Nissan job.

(emphasis added). ERM argues on appeal that the trial court erred in instructing the jury regarding loss of use insofar as the instruction suggested that damages for loss of use are recoverable when the injured property is replaced rather than repaired. As stated above, however, we recognize that a plaintiff may recover damages for loss of use or lost profits when the plaintiff's personal property has been negligently destroyed by the defendant and the property cannot be replaced within a reasonable period of time. In light of this holding, we find that the trial court's instruction regarding loss of use was proper under the unique circumstances of the case at bar.

Finally, ERM contends that the trial court erred in instructing the jury that it could award damages for profits lost by TSI as a result of the destruction of its shredding machine because these profits were uncertain and speculative. In order to recover lost profits, they must be proven with reasonable certainty and cannot be remote or speculative. *See, e.g., American Bldgs. Co.*, 676 S.W.2d at 562 (citing *Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Publishing Co.*, 298 S.W.2d 788, 793 (Tenn. App. 1956)). The plaintiff is not required, however, to prove the lost profits with mathematical precision. *See McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 200 (Tenn. App. 1990)(citing *Swartz v. Sanders*, 406 S.W.2d 70, 74-75 (Tenn. App. 1966); *Black v. Love & Amos Coal Co.*, 206 S.W.2d 432, 435 (Tenn. App. 1947)).

Because its shredding machine was destroyed, TSI was unable to complete the shredding of the boats at the Nissan facility. Consequently, TSI lost profits that it would have otherwise earned from the Nissan job.[5] Prior to the fire at the Nissan facility, TSI had entered into a contract with Niagara under which TSI agreed to use its shredding machine to destroy roofing materials for Niagara. According to Ms. Pointer, TSI's work under the Niagara contract was expected to last a minimum of six months. Russell Miller, a former employee of Niagara, testified that TSI's shredding machine was capable of shredding 1600 tons of asphalt roofing material per day. Jack Irwin, TSI's shredding expert, testified that the blades on TSI's shredding machine would have to be changed once per month in order for the machine to shred 1600 tons of asphalt shingles per day. At trial, TSI introduced into evidence a video tape demonstrating that a shredding machine identical to the one owned by TSI was capable of shredding seventy-seven tons of asphalt shingles

---

[5]The parties disagree regarding the amount of these lost profits.

in twenty minutes. TSI also introduced into evidence an itemized list of income that would have been earned and expenses that would have been incurred if TSI had completed its obligations under the Niagara contract. Based on these figures, Ms. Pointer estimated that, as a result of TSI's inability to perform under the Niagara contract, TSI lost net profits totaling $2,363,142.30.

Despite the aforementioned evidence, ERM contends that any lost profits associated with the Niagara project are uncertain and speculative. In *Anderson-Gregory Co. v. Lea*, 370 S.W.2d 934 (Tenn. App. 1963), the parties entered into a contract under which the plaintiff agreed to provide equipment for and supervise the removal of gravel that was to be delivered to the defendant. *See id.* at 935. In an action for breach of the contract, the jury awarded the plaintiff damages for lost profits. *See id.* On appeal, the court reduced the amount of the judgment, stating as follows:

> In the first place, it is the rule that speculative damages cannot be recovered. . . . The only evidence offered with respect to prospective profits on the contract was that of plaintiff, and in view of his testimony he had had no experience with dredging gravel from a river and preparing it for use on a highway, it is clear that as to a major part of the material to be furnished plaintiff had no information on which to base his estimation of profits.

*Id.* at 937.

In the instant case, TSI had never used its shredding machine to shred large quantifies of asphalt roofing materials. The shredding machine had been used, however, to destroy many other types of items including refrigerators, drums of a cement-type product, school buses, and truck axles. Ms. Pointer and Mr. Miller, both of whom are experienced in the shredding business, testified that TSI's machine was capable of shredding asphalt roofing materials. Thus, there is material evidence in the record upon which the jury could have found that TSI would have made a profit shredding asphalt roofing materials under the Niagara contract. We therefore reject ERM's contention that these lost profits were uncertain or speculative.

*Evidentiary Rulings*

On appeal, ERM challenges a number of evidentiary rulings made by the trial court. As an initial matter, we note that trial courts are generally afforded a great deal of discretion regarding the admission or exclusion of evidence. *See **Dockery v. Board of Professional Responsibility of the Supreme Court of Tennessee***, 937 S.W.2d 863, 866 (Tenn. 1996); ***Otis v. Cambridge Mut. Fire Ins. Co.***, 850 S.W.2d 439, 442 (Tenn. 1992); ***Young v. Young***, 971 S.W.2d 386, 392 (Tenn. App. 1997); ***Scott v. Jones Bros. Constr., Inc.***, 960 S.W.2d 589, 594 (Tenn. App. 1997); ***Hunter v. Burke***, 958 S.W.2d 751, 755 (Tenn. App. 1997). Accordingly, appellate courts will not interfere with a trial court's evidentiary rulings absent a clear abuse of discretion. *See **Dockery***, 937 S.W.2d at 866; ***Otis***, 850 S.W.2d at 442; ***Young***, 971 S.W.2d at 392; ***Scott***, 960 S.W.2d at 594; ***Hunter***, 958 S.W.2d at 755.

ERM first contends that the trial court erred in excluding from evidence pages 174-179 of Ms. Pointer's deposition. These excluded pages contain testimony regarding allegations of fault on the part of Nissan included in the answer and counter-claim that TSI filed in the Nissan lawsuit. TSI sought to exclude this portion of Ms. Pointer's deposition as improper opinion testimony by a lay witness. *See* T.R.E. 701. Regarding the admissibility of this testimony, the trial court ruled as follows:

> The Court believes and is of the opinion that to ask and offer as evidence, as it would be intended here, would really and truly invade the province of the jury, whose duty it will be ultimately to determine whether or not there is sufficient evidence to support the allegations and against what parties to assess fault. The Court, therefore, believes that it would be improper to offer as evidence deposition testimony such as has been given to the Court by way of example.
>
> . . . .
>
> . . . . The Court has been given pages 174 through 179 of the discovery deposition of Mrs. Pointer. The Court will grant the motion in limine with respect to the testimony contained within those pages . . . .

The trial court subsequently entered an order providing in pertinent part as follows:

> 13.     The parties shall not use deposition testimony that asks a party to comment on pleading allegations, such as that testimony in the deposition of Robin Pointer

> pages 174, et seq., and the Court shall rule in the future on similar issues when specific excerpts are brought to the Court's attention.

14.     The Court specifically excludes Robin Pointer[']s deposition pages 174 through 179.


Under the Tennessee Rules of Evidence, a lay witness may testify as to opinions or inferences that are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." T.R.E. 701(a). In her deposition, Ms. Pointer stated her opinion that Nissan was negligent (1) in failing to provide TSI with a safe, clean, and unobstructed work area, (2) in failing to exercise due care under the circumstances, (3) in failing to properly supervise and control the work being performed at the Nissan facility, and (4) in failing to comply with applicable safety regulations, laws, and ordinances. From the context of this testimony, it appears that this opinion is based at least in part on events perceived by Ms. Pointer. Nevertheless, we do not think that the opinion expressed by Ms. Pointer would have been helpful to the jury as required by Rule 701. Thus, to the extent that Ms. Pointer's deposition contains legal conclusions, we find that the trial court's ruling was proper. We note, however, that the excluded portion of Ms. Pointer's deposition also contains testimony regarding facts observed by Ms. Pointer. We find no basis for the exclusion of this non-opinion testimony. Nevertheless, because ERM could have elicited these same facts from Ms. Pointer using the answer and counter-claim that TSI filed in the Nissan lawsuit,[6] we think that the trial court's exclusion of this non-opinion testimony was harmless error. *See* Rule 36(b) T.R.A.P.


ERM also argues that the trial court erred in excluding from evidence certain trade journals[7] containing advertisements for the sale of shredding machines. The trial court ruled that these materials were inadmissible hearsay. ERM contends, however, that these trade journals are admissible under an exception to the hearsay rule. Rule 803 of the Tennessee Rules of Evidence provides in pertinent part as follows:

---

[6]Although the trial court prohibited ERM from using pages 174-79 of Ms. Pointer's deposition, the court's order did not prevent ERM from using TSI's answer and counter-claim. Additionally, we note that, during a pre-trial hearing, counsel for TSI expressly conceded that ERM could use pleadings during its examination of Ms. Pointer.

[7]These trade journals include publications entitled "Waste Age," "Resource Recycling," "Scrap Processing and Recycling," and "The Management of World Wastes."

The following are not excluded by the hearsay rule:

. . . .

(17)  Market Reports and Commercial Publications. Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations.

T.R.E. 803 (17).  The parties disagree regarding whether trade journals qualify as published compilations within the meaning of Rule 803(17).

We are aware of only one case in Tennessee discussing the requirements of Rule 803(17).  In *Frakes v. Cardiology Consultants, P.C.*, No. 01-A-01-9702-CV-00069, 1997 WL 536949 (Tenn. App. Aug. 29, 1997), the trial court permitted the defendant's attorney to question various witnesses using a guidelines table from a brochure that was produced by the American College of Cardiology and the American Heart Association.  *See id.* at *2, *3.  With respect to the applicability of Rule 803(17), this Court stated as follows:

The guidelines table is neither a market report nor a commercial publication, and despite the fact that all the expert witnesses agreed that cardiologists relied upon it we do not agree that it is the type of list that comes within paragraph 17 of Rule 803.

*Id.* at *5.  There are cases from other jurisdictions, however, wherein items similar to the trade journals in the instant case were held to be admissible under a rule identical to Rule 803(17).  *See United States v. Cassiere*, 4 F.3d 1006, 1018-19 (1st Cir. 1993)(monthly report listing properties sold, the sales prices, and the dates on which the sales were closed); *United States v. Grossman*, 614 F.2d 295, 297 (1st Cir. 1980)(catalog displaying pictures of and listing prices of Colibri cigarette lighters); *United States v. Johnson*, 515 F.2d 730, 732 n.4 (7th Cir. 1975)(publication entitled "Red Book" listing average values of certain automobiles); *Henry v. Serey*, 546 N.E.2d 474, 476 (Ohio Ct. App. 1989)("N.A.D.A. Official Used Car Guide" and other magazines containing advertisements for used automobiles), *overruled in part on other grounds by Dunn v. Westlake*, No. C-880422, 1990 WL 59262, at *4 (Ohio Ct. App. May 9, 1990); *Ohio v. Stickles*, No. 85AP-06, 1985 WL 10321, at *4 (Ohio Ct. App. June 13, 1985)(magazine entitled "Old Cars Price Guide").  Consistent with the rationale of these cases, we think that trade journals qualify as published compilations and

thus are admissible under Rule 803(17) as an exception to the hearsay rule.

Despite our conclusion that the trade journals in the instant case are not excludable under the hearsay rule, we find that the trial court could have excluded these items under Rule 403 of the Tennessee Rules of Evidence. Rule 403 provides as follows:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

T.R.E. 403. These trade journals contain advertisements for shredding machines and are relevant insofar as they suggest that TSI could have mitigated its damages by obtaining a replacement shredding machine. The majority of these advertisements, however, do not specify important information such as the type, capabilities, and availability of the shredding machine for sale. Rather, they contain only general information promoting certain manufacturers and dealers of shredding machines. Thus, we think this evidence is of little probative value. Additionally, we think that the admission of this evidence would have resulted in undue delay, waste of time, and needless presentation of cumulative evidence. During cross-examination, Ms. Pointer testified in pertinent part as follows:

Q.     Mrs. Pointer, at the time of this fire or just prior thereto did you subscribe to any trade publications?

A.     No, I didn't. I just got Commerce Business Daily at that time, which was a government bid list.

Q.     So have you had a chance to look at all these trade publications that have been made an exhibit?

A.     Yes.

Q.     You agree that these were available at that time?

A.     Some of them are dated like August.

Q.     All right.

A.     A lot of them are dated only up until February.

Q.     Well, this project was to last for six months, and after a week and you were fired from both jobs did you

Q. make any attempt at all to get another shredder during that six months?

A. Yes, I did.

Q. Did you consult any of these publications?

A. No. I consulted Allen Ross Machinery, and they had a locator service, and they would be a lot more current. Like if it was an August journal, then the ad had to have been run in July. I knew anything that was in there was already gone, you know, if it was worth having anyway, if it wasn't a piece of junk.

Counsel for Keating informed the trial court that he intended to question Ms. Pointer regarding each individual advertisement, stating "I know she says that she didn't subscribe to any of these, but I want to ask her about specific ads, did she call this one, did she call that one, did she talk to that one, does this have a shredder that would have done this job and so forth." He then stated to the trial court that he intended to use twenty-five to thirty pages of advertisements[8] and estimated that it would take him "a good hour" to question Ms. Pointer regarding these advertisements. Given Ms. Pointer's admission that she was aware of these trade publications but failed to consult them when attempting to find a replacement shredding machine, there was little need to further question Ms. Pointer using the actual advertisements. We thus conclude that, under the circumstances of the case at bar, the probative value of this evidence was substantially outweighed by considerations of undue delay, waste of time, and needless presentation of cumulative evidence and that, consequently, this evidence was excludable under Rule 403.

ERM also contends that the trial court erred with respect to the admission into evidence of Exhibit 24, a collection of documents relative to TSI's contract with Niagara. These documents include (1) findings of fact and decision of the Village of Forest View, Illinois regarding Niagara's request for local site approval for a resource recovery facility (unsigned), (2) Niagara's request for local site approval for a resource recovery facility, (3) Village of Forest View, Illinois Ordinance No. 90-2, (4) customer list of Asphalt Recovery Systems, Inc., (5) waste disposal agreement between the Village of Forest View, Illinois and Niagara dated April 24, 1990, (6) draft

---

[8]We note, however, that no less than 123 pages from these trade journals contain advertisements for shredding machines. These pages were marked, presumably by counsel for ERM or counsel for Keating, prior to the inclusion of the trade journals in the appellate record.

of agreement between Niagara and TSI (unsigned), (7) shipment records of Rye Gentry Trucking, Inc., (8) maps indicating the location of Niagara, (9) letter of intent from David Pemberton to TSI dated June 13, 1990, (10) letter from Robin Pointer to Lee Bishop dated May 29, 1990, (11) findings of fact and decision of the Village of Forest View, Illinois approving Niagara's application for local siting, (12) letter to Robin Pointer from Dan Moffatt dated April 1, 1991.

Counsel for ERM objected to the admission of these documents, arguing that they were inadmissable hearsay. The trial court disagreed, ruling that the entire collection of documents was admissible under the public records exception to the hearsay rule. Rule 803(8) of the Tennessee Rules of Evidence provides as follows:

> The following are not excluded by the hearsay rule:
>
> (8)    Public Records and Reports. Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness, records, reports, statements, or data compilations in any form of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, excluding, however, matters observed by police officers and other law enforcement personnel.

T.R.E. 803(8). Items (1), (2), (3), (5), and (11) are records that were either compiled by or submitted to a public entity known as the Village of Forest View, Illinois and are directly related to that entity's business activities with Niagara. There is no evidence suggesting a lack of trustworthiness regarding these documents. Thus, the trial court properly ruled that these items were admissible into evidence under Rule 803(8).

The remaining documents, items (4), (6), (7), (8), (9), (10), and (12), are not public records and thus, contrary to the trial court's ruling, are not admissible under Rule 803(8). TSI contends, however, that these items are admissible under the business records exception to the hearsay rule. Rule 803(6) of the Tennessee Rules of Evidence provides as follows:

> The following are not excluded by the hearsay rule:
>
> . . . .

(6) Records of Regularly Conducted Activity. A memorandum, report, record, or data compilation in any form of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes every kind of business, institution, association, profession, occupation, and calling, whether or not conducted for profit.

T.R.E. 803(6). The aforementioned items include a customer list, a draft agreement, shipping records, maps, and three pieces of correspondence. Such records are among the types of records that TSI would be likely to maintain in the ordinary course of its business. Additionally, there is no evidence of lack of trustworthiness with respect to these documents. We recognize that these documents were not authenticated through the testimony of TSI's custodian of records or another qualified witness. It appears, however, that the parties had stipulated that such authentication would not be required. During a pretrial hearing, counsel for TSI stated as follows:

The Court may recall that we have an agreement that the exhibits/documents are authenticated for business record purposes, although if there is an individual other type of objection to any of the documents, they may be made. That's our agreement. So there is no need to authenticate anything that's been produced. The only thing, in case there is some objection, we may need to take it up.

Counsel for Keating subsequently acknowledged the existence of this agreement, stating as follows: "They are authentic, but we did not agree that they would be -- we could object to any other grounds as to their admissibility. Only the authenticity is the only question that we agreed upon." In light of this waiver, we find that the trial court could have admitted items (4), (6), (7), (8), (9), (10), and (12) into evidence as business records under Rule 803(6). Thus, although the trial court erred in admitting these items as public records under Rule 803(8), we conclude that this error was harmless.

ERM next contends that the trial court improperly excluded certain testimony regarding Niagara's business practices. During an offer of proof conducted outside the presence of the jury, Russell Miller, a former employee of Niagara, testified that he resigned from his position

at Niagara because, among other things, he disagreed with the way that Niagara was doing business. Under TSI's contract with Niagara, TSI was entitled to receive thirty-five percent of the amount that Niagara charged its haulers. Mr. Miller testified that although Niagara intended to charge its haulers seventy-five dollars per ton, it intended to report to TSI that it was charging these haulers only forty-two dollars per ton. According to Mr. Miller, Niagara's president had recently been indicted in connection with Niagara's allegedly illegal business activities. The trial court sustained TSI's objection to this testimony, stating as follows:

> Well, needless to say the question is a difficult one for the Court. The Court believes that the evidence ought to be excluded under rule 403 because it would appear to the Court that these facts would not be relevant to Tire Shredders' ability to perform its contract with Niagara regardless of the stated reason for Mr. Miller to be leaving the company, whether or not, in fact, he was accurate about it in terms of being an illegal activity. The Court believes that such evidence would be only confusing and prejudicial and ought not to be considered by the jury in its deliberations.

The aforementioned testimony of Mr. Miller suggests that Niagara may have engaged in business practices that are unethical and/or illegal. There is no evidence, however, indicating that the questionable character of these activities would have prevented Niagara from performing under its contract with TSI. Thus, we find that this evidence has no relevance to the case at bar and that the trial court could have excluded Mr. Miller's testimony under Rule 402 of the Tennessee Rules of Evidence. Assuming, however, that this testimony has any relevance whatsoever, we agree with the trial court that its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Thus, we conclude that the trial court did not err in excluding Mr. Miller's testimony regarding Niagara's business practices under Rule 403.

ERM also argues on appeal that the trial court improperly allowed Jack Irwin to testify as an expert witness. In support of this position, ERM first notes that counsel for TSI failed to formally tender Mr. Irwin as an expert witness in any particular area of expertise. ERM does not, however, direct us to any authority in Tennessee requiring the formal tender of a witness prior to the giving of expert testimony. Nor has our independent research revealed any such requirement. In the instant case, counsel for TSI did not formally tender Mr. Irwin as an expert witness but instead simply informed the trial court of the types of questions that he intended to ask Mr. Irwin. During

voir dire, counsel for TSI questioned Mr. Irwin regarding his qualifications and made an offer of proof with respect to the facts and opinions that he expected to elicit from Mr. Irwin if the trial court permitted Mr. Irwin to testify in the presence of the jury. Additionally, counsel for ERM engaged in an extensive cross-examination of Mr. Irwin. The sole purpose of questioning Mr. Irwin in this manner was to establish whether he was qualified to testify as an expert witness. Thus, counsel for ERM must have understood that counsel for TSI intended to elicit expert testimony from Mr. Irwin in the presence of the jury. Under such circumstances, we do not think it was necessary for counsel for TSI to formally tender Mr. Irwin as an expert witness. Furthermore, with the respect to Mr. Irwin's qualifications as an expert witness, the trial court ruled as follows:

> All right. This question is a difficult one, obviously, for the Court. Having heard the voir dire examination of Mr. Irwin, the Court is of the opinion that even though Mr. Irwin has not qualified as an expert in the field of tire shredding machines, the opinions which he will be called upon to make as part of his testimony in this case go somewhat beyond that particular subject into a broader field. The Court believes that based upon his background and experience he does possess sufficient knowledge as would permit him to express the opinions which have been elicited during his voir dire examination. The Court will permit him to testify on those subjects.

Alternatively, ERM argues that the trial court should have excluded Mr. Irwin's testimony because he was not qualified to serve as an expert witness and because the opinions expressed by Mr. Irwin were based on facts and data that are untrustworthy. At no time during the trial court proceedings, however, did ERM object to the admission of Mr. Irwin's testimony on these grounds. In order to challenge on appeal a trial court's admission of evidence, there must appear in the record a timely and specific objection to the evidence or motion to strike the evidence. *See* T.R.E. 103(a)(1). *See also State v. Melson*, 638 S.W.2d 342, 363 (Tenn. 1982); *Adams v. Manis*, 859 S.W.2d 323, 328 (Tenn. App. 1993); *Wright v. United Servs. Auto. Ass'n*, 789 S.W.2d 911, 914 (Tenn. App. 1990); *Bryant v. State*, 549 S.W.2d 956, 957 (Tenn. Crim. App. 1977). Because no such objection or motion to strike appears in the record of the case at bar, we find that ERM has waived its right to appeal the admission of Mr. Irwin's testimony. Nevertheless, we note that trial courts are afforded wide discretion with respect the qualification of expert witnesses. *See McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993); *Otis*, 850 S.W.2d at 443. The trial court determines whether a witness qualifies as

an expert. T.R.E. 104(a). Absent an abuse of discretion, we may not disturb a trial court's decision regarding whether to allow a witness to testify as an expert. *See State v. Anderson*, 880 S.W.2d 720, 728 (Tenn. Crim. App. 1994); *Underwood v. Waterslides of Mid-America, Inc.*, 823 S.W.2d 171, 182 (Tenn. App. 1991); *State v. Taylor*, 645 S.W.2d 759, 762 (Tenn. Crim. App. 1982); *State v. Wiseman*, 643 S.W.2d 354, 364 (Tenn. Crim. App. 1982).

We further note from the record that Mr. Irwin is an environmental consultant with a bachelor of science degree in mechanical engineering. He became active in the shredding business in 1987 and designed his own tire shredding machine in 1990. Mr. Irwin testified extensively regarding the features and capabilities of different types of shredding machines, thus demonstrating his knowledge of these machines. During voir dire, however, Mr. Irwin testified there were several differences between his shredding machine and the one owned by TSI. Additionally, Mr. Irwin testified that, although he had on three separate occasions observed the shredding of asphalt shingles, he had never used his machine to shred this type of material. Given his knowledge of shredding machines and his experience in the shredding industry, we cannot say that the trial court abused its discretion in allowing Mr. Irwin to testify as an expert witness.

Finally, ERM contends that the trial court erred in excluding from evidence the opinion of Charles Thomas Pittman, a fire investigator employed by the City of Memphis Fire Department, regarding the cause and origin of the fire that occurred at the Nissan facility. During an offer of proof, Mr. Pittman testified that, on his report, he listed that the fire was caused by a malfunction in TSI's shredding machine. The trial court sustained TSI's objection to this testimony. Under Rule 703 of the Tennessee Rules of Evidence, "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." T.R.E. 703. Mr. Pittman testified that he did not have any memory of the fire. He could not recall any particular problem with the shredding machine or explain the way in which the shredding machine allegedly malfunctioned. Rather, Mr. Pittman appears to have based his opinion entirely on the statements of individuals at the scene who informed him that the fire started in and around the exhaust system of the shredding machine. Under such circumstances, we find that the trustworthiness of the facts underlying Mr. Pittman's opinion testimony is questionable. Thus, we conclude that the trial court did not abuse its discretion in excluding this testimony from evidence.

***Conclusion***

Based on the foregoing, the judgment below is in all respects affirmed.  The costs of this appeal are charged to ERM, for which execution may issue if necessary.

_____
FARMER, J.

_____
HIGHERS, J. (Concurs)

_____
TOMLIN, Sp. J. (Concurs)