IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 4, 2018 Session

## JOY LITTLETON ET AL. v. TIS INSURANCE SERVICES, INC.

Appeal from the Circuit Court for Knox County
No. C-11-034211     Deborah C. Stevens, Judge

_____

### No. E2018-00477-COA-R3-CV
_____

In this professional negligence case against an insurance agent, Appellants appeal from the trial court's order excluding their expert's opinion on the applicable standard of care. We affirm in part, reverse in part, and vacate in part.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; and Vacated in Part**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and THOMAS R. FRIERSON, II, JJ., joined.

Robert B. Littleton, Nashville, Tennessee and Robert R. Kurtz, Knoxville, Tennessee, for the appellants, Joy Littleton, Grayling Littleton, and Will Allen Hildreth, As Assignees of Merit Construction, Inc.

Nathaniel K. Cherry and Barry L. Howard, Nashville, Tennessee, for the appellee, TIS Insurance Services, Inc.

### OPINION

#### Procedural History

This case involves a relatively simple issue with a relatively complicated backstory. In 2003, JAG Properties, LLC ("JAG"), sued Merit Construction, Inc., d/b/a Merit Construction ("Merit") for damages related to the construction of a Holiday Inn Express. *See **JAG Properties, LLC v. Merit Construction, Inc., d/b/a Merit Construction,*** No. 10296, Chancery Court of Loudon County, Tennessee ("the Merit Litigation"). Eventually, Merit agreed to settle the suit for $3.9 million. As a result of the settlement, Merit consented to the entry of a judgment against it for $3.9 million and assigned to JAG all rights, causes of action, and other claims that Merit had or might have had against its own insurers, Merit's broker, and Merit's agents arising from or in

connection with the dispute between Merit and its own insurers, broker, and agents (collectively, "the Order and Settlement Agreement"). A judgment to this effect was entered in the Merit Litigation on November 1, 2004.

Following the judgment, JAG was able to collect only a portion of the award against Merit because Merit's Commercial General Liability carrier, the Highlands Insurance Group ("Highlands"), was placed in receivership by the State of Texas. At some point, JAG assigned its rights to the judgment and all accompanying rights to its principals, Plaintiffs/Appellants Joy Littleton, Grayling Littleton, and Will Allen Hildreth ("Appellants").

Pursuant to the assignments, Appellants filed a complaint against Merit's insurance broker, Defendant/Appellee TIS Insurance Services, Inc. ("TIS") on January 28, 2011. The complaint alleged causes of action for negligence, fraud, negligent misrepresentation, and violation of the Tennessee Consumer Protection Act ("TCPA"). The complaint sought the remaining balance on the $3.9 million judgment, an amount of approximately $2.67 million, as well as pre- and post-judgment interest. The claims alleged related to TIS' procurement of the Highlands' general commercial insurance policy, as discussed in detail *infra*.

TIS filed an answer denying liability on February 28, 2011. TIS later filed a motion for judgment on the pleadings, alleging that the damages against it were limited to $25,000.00. Specifically, the motion stated that "Merit sustained $25,000.00 in actual compensatory damages since this is the amount paid to JAG to settle the Merit Litigation, and JAG agreed, pursuant to the Order and Settlement Agreement to not execute on the remainder of the $3.9 million judgment, even should JAG be unable to recover the excess from other parties." The trial court granted the motion by order of October 12, 2012. Although the trial court granted a motion requesting permission to seek an interlocutory appeal to this Court, we denied the application by order of February 8, 2013.

On September 12, 2013, Appellants sought leave to amend their complaint to show that the $25,000.00 payment was not a payment on the judgment in the Merit Litigation. The trial court granted the motion and an amended complaint was filed on October 16, 2013. The amended complaint now stated that Merit paid $0.00 toward the judgment in the Merit Litigation. The trial court thereafter revised its partial grant of the motion on the pleadings, ruling that Appellants would not be entitled to recover any compensatory damages. The trial court therefore dismissed the complaint. Appellants appealed to this Court, which reversed the judgment of the trial court, reiterating precedent that

> [A] judgment creditor's covenant not to execute on a judgment debtor's assets does not "extinguish the underlying liability" of the judgment debtor for compensatory damages. The judgment debtor is an "injured party" that

can pursue a negligence claim against its insurance provider for procuring a liability policy that allowed a gap in coverage.

*Littleton v. TIS Ins. Servs., Inc.*, No. E2014-00938-COA-R3-CV, 2015 WL 443740, at *3 (Tenn. Ct. App. Feb. 3, 2015) (citing *Tip's Package Store, Inc. v. Commercial Insurance Managers, Inc.,* 86 S.W.3d 543 (Tenn. Ct. App. 2001)). The Court therefore ruled that Appellants could seek the balance of the $3.9 million judgment from TIS. *Id.* at *4.

After the case was remanded to the trial court, TIS filed a motion for summary judgment. The motion was eventually granted as to claims of fraud, negligent misrepresentation and the TCPA. Appellants' negligence claims survived, however, apparently due to disputes of material facts created by the parties' competing experts. Defendants then sought to exclude Appellants' expert witness, a motion the trial court granted on March 21, 2017. TIS thereafter filed a second motion for summary judgment on the negligence claim, as Appellants had no expert to support the claim.

On August 22, 2017, Appellants disclosed a new expert, William H. Bahr, along with his report and resume. Appellants also responded in opposition to the second motion for summary judgment. TIS responded by filing a motion to exclude Mr. Bahr's testimony as being untimely disclosed. The trial court denied the motion to exclude on this basis, but the trial court ruled that no additional experts could be disclosed. Additional discovery ensued.

On December 11, 2017, TIS filed another motion to exclude Mr. Bahr's testimony, this time on the basis that he was not qualified to testify as to the matters at issue. In support, TIS relied on Mr. Bahr's previously submitted report and resume, as well as his deposition testimony. Appellants responded in opposition, relying in part on a declaration provided by Mr. Bahr. Following argument on the motion, the trial court entered an order granting the motion in part and denying the motion in part on February 8, 2018. Specifically, the trial court ruled that Mr. Bahr would not be permitted to testify regarding breach of the standard of care by TIS' agents "as it relates to their sale of the Commercial General Liability ("CGL") Policy to insure Merit[.]" Additionally, the trial court ruled that Mr. Bahr could not testify that TIS had an obligation to notify Merit about an insurance company's "ratings drop" or that such a failure of notification was a breach of the standard of care. The trial court ruled, however, that Mr. Bahr could testify as to some other matters, discussed *infra*. Following the exclusion of their expert and the expiration of the trial court's scheduling order allowing the disclosure of new experts, Appellants conceded that they could not present evidence of every necessary element of their negligence claim. Consequently, on February 16, 2018, the trial court granted TIS' motion for summary judgment dismissing the final remaining claim for professional negligence. Appellants therefore appealed to this Court.

**Facts Relevant to Summary Judgment**

- 3 -

The facts related to the claim against TIS are largely undisputed for purposes of this appeal.[1] Prior to the 2000 construction year, Merit asked its insurance agent, TIS, to procure commercial general liability insurance with an A.M. Best Company rating of "A."[2] TIS presented Merit with three options for the year 2000: a policy from Highlands, a policy from Zurich, and a policy from CNA. Merit chose a $1 million policy from Highlands, which had an A.M. Best Company rating of "B++." TIS procured the policy for Highlands, as well as a "cut-through" endorsement from American Healthcare Indemnity Company.[3] According to TIS' statement of undisputed material facts, the purpose of the cut-through endorsement was "to raise the Highlands policy to an A-rating for [Merit's] insurance needs for the year 2000." Merit was aware of Highlands' lower rating and had previously utilized a cut-through endorsement in the past. At the time the Highlands policy was chosen, however, Merit was given no financial information concerning Highlands or the other insurance carriers. Indeed, when TIS presented the three options to Merit, TIS' agent indicated that all three companies were A-rated companies with the cut-through endorsement from Highlands and that Merit understood that the cut-through endorsement would raise Highlands' rating to the required level. TIS,

---

[1] We take these facts from the undisputed material facts filed by each party that were not in dispute.

[2] A.M. Best ratings are generally accepted in the insurance industry as providing evidence of an insurance company's financial stability.

[3] The terms "cut-through" and "pass-through" are used interchangeably in the record to describe agreements for reinsurance:

> The cut-through endorsement is so named because it "cuts through" the usual route of claim payment from reinsurer-to-insurer, and substitutes instead reinsurer-to-claimant. By whatever name, the forms are issued by the reinsurer or on its behalf to such payees in advance. These endorsements usually are contingent upon the insurer being unable to pay claims, but there is no standard form. The use of cut-through endorsements occurs only on request of mortgagees or some insureds and is a practice which ceding insurers would rather avoid.
>
> Such a situation may come about because banks and other financial institutions, as mortgagees, are often unwilling to accept policies of certain insurers as protection for collateral unless an insurer is satisfactorily rated by A.M. Best Company, the financial rating organization of the insurance industry. While the absence of a satisfactory rating may indicate that an insurer is weak financially, often a rating is withheld only because a company is too young or too small to qualify. To assuage such mortgagees, and to improve the marketability of their client reinsureds' policies, many reinsurers will offer to issue "cut-through" endorsements for the primary insurer's policies.

§ 16:2. *Claimants, Law of Reinsurance* § 16:2 (footnote omitted); *see also* § 6:10. *Obtaining satisfactory brokerage service, Mod. Corp. Checklists* § 6:10 (explaining that cut-through endorsements "provide the insured with direct access to reinsurance for the prosecution of any claim should the basic company be financially impaired or rendered insolvent"). Likewise, the parties refer to these contracts as both agreements and endorsements. We will generally refer to this agreement as a "cut-through endorsement" in this opinion.

through its agent, did not fully explain to Merit how the cut-through endorsement would operate or the specific language of the cut-through endorsement, which provided that the policy would be triggered only if Highlands was "declared insolvent by a court of competent jurisdiction." On July 10, 2001, Highlands was down-graded to a "B" rating; TIS did not inform Merit of the downgrade or offer to move Merit's coverage to another, higher-rated company.

Each party provided competing expert testimony as to whether this series of events amounted to a breach of the standard of care by TIS. Relevant to this appeal, Appellants' expert, Mr. Bahr, a licensed insurance agent with decades of experience in insurance consulting, testified that TIS breached the applicable standard of care in recommending Highlands to Merit even though the policy did not meet the financial rating specifications required by Merit. Mr. Bahr explained that the cut-through endorsement did not alter or increase Highlands' financial rating, contrary to TIS' assertions to Merit. According to Mr. Bahr, this cut-through endorsement was not properly explained to Merit and, when Highlands' own rating fell sharply in 2001,[4] TIS failed to inform Merit of the serious decline in Highlands' financial condition and offer to move Merit's coverage to another insurance carrier. These actions, according to Mr. Bahr, were a breach of the applicable standard of care.

## Issues Presented

Appellants present two issues for this Court's review, which are slightly restated from Appellants' brief:

1. Whether the trial court erred in excluding the testimony of Appellants' expert witness, Mr. Bahr, as to the standard of care required of an insurance agent in Tennessee and as to whether TIS breached that standard of care?

2. Whether the trial court erred in granting summary judgment for TIS?

Appellants generally concede, however, that if the trial court did not abuse its discretion in excluding Mr. Bahr's standard of care opinion, summary judgment was properly granted.

## Discussion

"A cause of action for failure to procure insurance is separate and distinct from any cause of action against an insurer or a proposed insurer; in a failure to procure claim, 'the agent, rather than [the] insurance company, is independently liable.'" **Morrison v. Allen**, 338 S.W.3d 417, 426 (Tenn. 2011) (quoting 43 Am.Jur.2d *Insurance* § 163 (2003)). "An agent or broker is liable for failure to procure 'on the theory that he or she is the agent of the insured in negotiating for a policy, and owes a duty to the principal to

---

[4] Mr. Bahr explained that while a B++ rating indicated that a company was financially secure, a B rating placed the company in the "vulnerable category."

exercise reasonable skill, care, and diligence in effecting the insurance.'" *Id.* (quoting 43 Am.Jur.2d *Insurance* § 163 (citations omitted)). The Tennessee Supreme Court has explained that such a claim may sound in negligence or breach of contract. *Cf. id.* ("While other jurisdictions and secondary authority generally recognize that a failure to procure claim may be based on either negligence or breach of contract, . . . we limit our discussion in this case to the latter.") (citations omitted). Situations wherein an insured may recover damages include both a complete failure to procure insurance as well as "instances where coverage was acquired, but was inadequate in light of the agreement between the insured and the agent." *Id.* at 426–27 (citing *Bell v. Wood Insurance Agency*, 829 S.W.2d 153 (Tenn. Ct. App. 1992) (affirming a judgment in favor of the insured where the insurance agent obtained far less coverage than directed)).

In this case, Appellants' claim against TIS sounds in professional negligence. Generally, a negligence action requires proof of the following elements: duty, breach of duty, causation, and damages. *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993). "[I]nsurance agents, like other licensed professionals, owe a duty to their clients to perform consistent with the standards of care of their profession." *Id.* at 450 (Koch, J., concurring in part, dissenting in part) (citing 1 *New Appleman on Insurance Law* § 2.05[1]-[2], at 2-26 to -27); *see also* *Permanent Gen. Assur. Corp. v. Jones*, No. 01A01-9310-CV-00430, 1994 WL 137819, at *2 (Tenn. Ct. App. Apr. 20, 1994) (affirming the dismissal of a malpractice action against an insurance agent where there was no evidence of the standard of care applicable in the situation). As the Tennessee Supreme Court has explained:

> Tennessee's courts have held repeatedly that determining whether a professional's conduct complies with the applicable standard of care is beyond the common knowledge of lay persons. Thus, expert testimony is required to establish not only the applicable standard of care but also whether the conduct at issue fell below that standard. Expert testimony cannot be dispensed with unless the professional's lack of skill or care is so apparent as to be in the comprehension of a lay person and requires only common knowledge and experience to understand it.

*Martin v. Sizemore*, 78 S.W.3d 249, 272 (Tenn. Ct. App. 2001).

Here, Appellants do not contend that the standard of care applicable to TIS can be determined by lay persons. Rather, they assert that they presented competent proof of the applicable standard of care through the report and testimony of Mr. Bahr and that the trial court erred in excluding this proof. Thus, the central dispute in this case involves whether the trial court abused its discretion in excluding testimony by the Appellants' chosen expert, Mr. Bahr, as to the standard of care. We therefore proceed to consider that issue.

**II.**

As explained by the Tennessee Supreme Court:

> An essential role of the judge, as the neutral arbiter in the trial, is to function as a "gatekeeper" with regard to the admissibility of expert testimony, permitting only expert opinions that are based on "relevant scientific methods, processes, and data, and not upon [the] expert's mere speculation." *State v. Scott*, 275 S.W.3d 395, 401–02 (Tenn. 2009) (quoting *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997)) (citing *State v. Copeland*, 226 S.W.3d 287, 300–01 (Tenn. 2007)). Specifically, the admission of expert proof is governed by Tennessee Rule of Evidence 702, which explains that a qualified expert witness "may testify in the form of an opinion or otherwise" if the expert has "scientific, technical, or other specialized knowledge [that] will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." (Emphasis added.) Tennessee Rule of Evidence 703 provides further guidance:

> > The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. . . . The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

> (Emphasis added.) "While a trial court's role as a gatekeeper is critical, it is not unconstrained," *Scott*, 275 S.W.3d at 404, and "[a] trial court abuses its discretion when it . . . excludes testimony that meets the requirements of Rule[s] 702 and 703," *Shipley v. Williams*, 350 S.W.3d 527, 552 (Tenn. 2011).

> Read together, Rules 702 and 703 "require a determination as to the scientific validity or reliability of the expert testimony," because only valid scientific evidence "will substantially assist the trier of fact to determine a fact in issue" and will be based upon "facts and data [that have been] reviewed and found to be trustworthy by the trial court." *McDaniel*, 955 S.W.2d at 265. In *McDaniel*, this Court provided a non-exclusive list of factors to aid trial courts in the consideration of whether expert testimony qualifies as reliable and is therefore admissible under the rules:

> > (1) whether [the] evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the

> evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Id.* Rigid application of the ***McDaniel*** factors, however, is not required; the reliability of the testimony and whether it provides substantial assistance to the jury serve as the essential guidelines for the determination of admissibility. *Id.* (declining to expressly adopt the federal framework for evaluating expert testimony and instructing Tennessee trial courts that they "may consider" the ***McDaniel*** factors within the framework of Rules 702 and 703); *see also* ***Copeland***, 226 S.W.3d at 302. Ultimately, "[t]he objective of the trial court's gatekeeping function is to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" ***Brown v. Crown Equip. Corp.***, 181 S.W.3d 268, 275 (Tenn. 2005) (quoting ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). If the expert testimony qualifies as admissible, the trial court's gatekeeping function is completed, as "[t]he weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact." *Id.* (citing ***McDaniel***, 955 S.W.2d at 265).

***Payne v. CSX Transportation, Inc.***, 467 S.W.3d 413, 454–55 (Tenn. 2015) (footnotes omitted). The ***McDaniel*** factors are not exclusive and the Tennessee Supreme Court has recognized that they may not be as helpful in cases where an expert's knowledge is derived from personal experience. *See* ***Brown***, 181 S.W.3d at 274–75. In such a case, another factor that may be particularly applicable "is the expert's qualifications for testifying on the subject at issue." *Id.* Under this analysis, the trial court must first determine "in essence, . . . whether the witness is an expert, either through knowledge, skill, experience, training, or education, in the area he or she is providing testimony." ***State v. Scott***, 275 S.W.3d 395, 402 (Tenn. 2009) (citing Tenn. R. Evid. 702).

An overview of Mr. Bahr's qualifications and opinion is necessary to our analysis. Although we will not tax the length of this opinion with a list of Mr. Bahr's credentials, a summary of his experience is helpful. Mr. Bahr, who holds a bachelor's degree in Business Administration, an associate's degree in Risk Management, and various other educational credentials related to insurance issues, has been continuously licensed as an insurance agent in Tennessee since 1971. After approximately a decade working as an insurance agent, often working with construction clients, Mr. Bahr transitioned to risk management in 1981. In 1988, Mr. Bahr opened his own insurance consulting agency, which he continues to operate to this day. Although Mr. Bahr's experience with cut-through endorsements is limited, as discussed in detail *infra*, his general experience with insurance and risk management can be described as nothing less than extensive.

Purportedly based on both his personal experience and research conducted for this litigation, Mr. Bahr, citing the International Risk Management Institute, defined a cut-through endorsement as a "reinsurance contract endorsement proving that, in the event of the cedent's insolvency, the reinsurer will pay any loss covered by the reinsurance contract, directly to the insured."[5] According to Mr. Bahr, such an endorsement does not alter the initial company's financial rating and only comes into play should the initial insurance company become insolvent.[6] In dispute are the following opinions by Mr. Bahr related to the standard of care required under the circumstances at issue, which are taken from Mr. Bahr's report:

> It is incumbent upon any insurance agent to make his/her customer aware of the financial condition of the insurance company he/she proposes. This is especially true if said customer informs the agent that the insurance company must meet certain financial criteria in order to be considered. For example, should a customer state that ONLY companies with an AM Best (a noted insurance financial rating company) rating of "B" or better will be considered, an insurance company with less than this rating should not be presented to the customer. Furthermore, at the very least, it is normal practice that some sort of Insurance Company Financial Rating be indicated in any insurance quote for each insurance company proposed.

> Furthermore, should the insurance rating decline, the insured should be notified of this fact at the earliest possible date, and the customer should be offered the opportunity to move his insurance to a more financially stable insurance company. For example, should the AM Best Company lower a "B+" rated company to a "B" rating, the customer should be notified and options offered the customer to move the insurance program. Should serious lowering (2 or more category ratings) of the insurance company's rating occur (for example declining from a "B+" to a "B-") moving the insurance program to another, more stable insurance company should be recommended and implemented at the earliest possible opportunity.

Mr. Bahr further opined that TIS breached this standard of care when it presented Highlands to Merit despite the fact that Merit requested only "A" rated insurance companies and Highlands was rated no more than "B++." Moreover, Mr. Bahr indicated that the cut-through endorsement did not change Highlands' rating and that such agreement should have been disclosed to Merit and the language of the agreement thoroughly explained to Merit. Further, when Highlands was downgraded to a "B" rating

---

[5] A "cedent" is synonymous with "reinsured," which is defined as "[a]n insurer that transfers all or part of a risk it underwrites to a reinsurer[.]" *Black's Law Dictionary* 1399 (9th ed. 2009).

[6] Mr. Bahr stated that the cut-through endorsement could alter a financial rating if there was a "fronting contract," a contract that is not at issue in this case.

in July 2001, Mr. Bahr testified that TIS should have informed Merit of the "serious demotion" and offered to move Merit's insurance coverage to a higher rated company. Finally, Mr. Bahr explained:

> The fact that TIS presented to Merit a bid from an insurance company that did not meet its financial rating requirements, coupled with TIS's failure to accurately explain the "pass through" agreement, along with its failure to move, or even advise Merit to move to a more financially stable insurance company upon knowledge of Highlands' downgrading, is certainly not the standard of care expected of an ordinary insurance agent. . . .

Based upon this report, as well as Mr. Bahr's deposition and declaration, the trial court ruled that Mr. Bahr was unqualified to opine as to the standard of care and any alleged breaches thereof in this case. The trial court's rationale for excluding Mr. Bahr's standard of care opinion was issued orally and spans several pages with interjections from counsel. In relevant part, the trial court found as follows:

> [One of Mr. Bahr's opinions is:] "Even after presenting Highlands Insurance Company, TIS should have shown Merit a pass-through agreement wording, explain it to them correctly, and obtain a signed letter from Merit confirming their understanding or acknowledgment of Highland[s] Insurance Company's low rate."
> As I read through his deposition, that's nothing he's ever done, and he's unaware of any agreement that anybody else has ever asked anybody to sign. And he said is that, you know, doing -- offering a policy with a cut-through endorsement, there is no business reason not to do that.
> So I have a hard time with the third paragraph of his opinion which says, like I said, that dealing with what TIS should have done when presented with a pass-through endorsement.
> That's his personal opinion of what that should be. I don't know. I'm struggling with where the expertise lies in that, based upon his experience, given his deposition testimony and even assuming his declaration.
>
> * * *
>
> [H]e clearly is involved in the insurance business, but he's very specific in his lack of knowledge of cut-through endorsements.
> He's not -- he's never sold a policy with a cut-through endorsement. He's never, in his consulting role, identified any cut-through endorsement that he's dealt with.
> He doesn't say, "In my consulting role, we have had six" -- let's assume they were banks. "I had six banks that were using cut-through endorsements, and this is what the agents did when they sold it. They

- 10 -

followed this A, B, C, D and E." So I have a really hard time on that issue of what an agent should or shouldn't do.

He agrees there's no -- nothing's wrong with offering a policy with a cut-through endorsement, but then he goes on to say, "But if you're going to do it, this is how you should do it," and that's where I have a problem with his experience and background.

\* \* \*

Based upon his experience, I think he can say [what a cut-through endorsement is, how they are used, and that a lower rated company with a cut-through endorsement is not the same as a company with higher rating].

I think he then can't then go forward and say, based upon my experience, if you're going to sell a cut-through endorsement, this is how it should be sold by getting a signed agreement, by providing this information, by monitoring, you know, for the downgrading of a company, because he's just got nothing in his deposition or his declaration or in his report that is an experiential. It's just his opinion.

Appellants contend that the trial court's decision to exclude Mr. Bahr's standard of care opinion is illogical and against the weight of the evidence. In support, Appellants point out that Mr. Bahr has been a licensed insurance agent since 1971. There is no dispute that in that time, Mr. Bahr sold, underwrote, advised, and taught about insurance. Additionally, Mr. Bahr holds several "premier designations in the insurance industry," particularly in the field of risk management. Indeed, rather than selling insurance, Mr. Bahr has instead been employed as an insurance consultant since 1988.

In contrast, however, TIS points out that Mr. Bahr worked as an insurance agent for less than ten years, over three decades ago. In addition, TIS takes issue with Mr. Bahr's knowledge and experience as it related to cut-through endorsements. TIS contends that Mr. Bahr is unqualified to opine as the effect of these agreements on the standard of care where Mr. Bahr admitted that he had never sold an insurance policy with a cut-through endorsement. Indeed, Mr. Bahr testified that in his nearly fifty-year career, he encountered a cut-through endorsement only once before in his consulting business and never when he was an insurance agent. Moreover, Mr. Bahr admitted in his testimony that the standard of care he was espousing was not gleaned from any specific industry rule or regulation on the subject, but only from his, mostly internet, research and personal experience. Likewise, when asked whether it was a standard practice to "get a signed acknowledgement regarding cut-through endorsements at that time," Mr. Bahr responded, "Being not familiar with them, . . . I really couldn't answer that question one way or the other."

- 11 -

In response, Appellants point to the clarifications offered by Mr. Bahr in his declaration. Therein, Mr. Bahr explained that his opinions are based upon his personal experience as an insurance agent and insurance consultant. Additionally, Mr. Bahr clarified that while he has never utilized a cut-through agreement,

> I am very familiar with what it is and its purpose. I am also fully familiar with the standard of care in Tennessee that an insurance agent should follow in selling a cut through endorsement as part of a policy and that standard of care was not followed by TIS in this case.

Appellants also point out that when Mr. Bahr was faced with the prospect of a cut-through endorsement in his consulting business, he fully explained the ramifications of the policy to his client, including that the agreement would not transform a lower rated company into a higher rated company, in accordance with his stated standard of care. Finally, Appellants contend that the trial court's ruling is against logic in that Mr. Bahr was allowed to testify as to the mechanics of cut-through endorsements, but was apparently unqualified to testify to the standard of care applicable when one is sold to a client.

As we perceive it, Mr. Bahr's testimony, if accepted, addresses three points where TIS' conduct fell below the standard of care: (1) when TIS offered the Highlands' policy to Merit even though it did not meet Merit's requirement that the company be at least "A" rated and allegedly incorrectly informed Merit that the cut-through endorsement raised Highlands' financial rating; (2) when TIS failed to properly notify and thoroughly explain the cut-through endorsement to Merit; and (3) when TIS failed to notify Merit when Highlands' rating fell by two grades, which TIS allegedly failed to do based on a misunderstanding of the effect of the cut-through agreement. In reaching these opinions, Mr. Bahr necessarily opined that the applicable standard of care required such actions. The trial court's issue, however, is that Mr. Bahr undisputedly had very little experience with cut-through endorsements and no experience from the agent-perspective in offering them to an insurance client.

We begin with Mr. Bahr's standard of care opinion as to whether TIS properly notified Merit of the cut-through endorsement by obtaining a signed letter confirming Merit's understanding of the endorsement. After our review, we agree that Mr. Bahr is not qualified to express this opinion. Here, Appellants' brief makes clear that Mr. Bahr's expertise results from his experience, rather than any kind of educational or scientific knowledge. Indeed, when asked where he obtained his opinion regarding the standard of care, Mr. Bahr explained that it was derived "from some of the information I received online and also from personal experience." Mr. Bahr then conceded that the online information that he reviewed was not specific to Tennessee and that his opinion regarding the standard of care of insurance agents in Tennessee came "from my experience of being not only an insurance agent in Tennessee but as a consultant for clients and working with

agents in Tennessee."[7] This experience, however, simply does not include any more than minimal contact with cut-through endorsements, the type of endorsement at issue here. Despite his relative lack of experience with cut-through endorsements, at least a portion of Mr. Bahr's standard of care opinion focuses on whether TIS "'exercise[d] reasonable skill, care, and diligence in'" connection with the cut-through agreement. *Morrison*, 338 S.W.3d at 426 (quoting 43 Am.Jur.2d *Insurance* § 163 (citations omitted)).

The deficiency in Mr. Bahr's experience with regard to the cut-through endorsement is exemplified in his deposition testimony. Initially, Mr. Bahr agreed that it was "a standard practice" to obtain "some kind of signed acknowledgement from Merit regarding, . . . their understanding of the financial condition of the companies and their decision to ultimately go with Highlands [Insurance Company]." Mr. Bahr admitted, however, that no rule or regulation supported this standard. Finally, when asked whether it was "standard to get a signed acknowledgement regarding cut-through endorsements at that time," Mr. Bahr testified that he lacked sufficient familiarity with the practice to offer an opinion. Although the standard of care is not necessarily determined by what a majority of professionals would do in the same circumstances, *see, e.g., Godbee v. Dimick*, 213 S.W.3d 865, 896 (Tenn. Ct. App. 2006) (holding that the trial court properly excluded testimony regarding the practice of "most spinal surgeons" because "the practice of the majority of physicians in a community is not analogous to the standard of care in a community" but that the trial court erred when it excluded testimony referring to the "generally accepted approach" and the "generally accepted practice" consistent with the standard of care), an expert must demonstrate sufficient familiarity with the subject matter at issue. *Cf. Tire Shredders, Inc. v. ERM-N. Cent., Inc.*, 15 S.W.3d 849, 864 (Tenn. Ct. App. 1999) (holding that a witness was sufficiently familiar with the subject matter when he had worked in the subject business for years and had witnessed the use of the machine at issue on three prior occasions); *State v. Haun*, 695 S.W.2d 546, 551 (Tenn. Crim. App. 1985) (affirming the trial court's decision to exclude an expert's testimony where he admitted that he was not sufficiently knowledgeable regarding the specific subject matter at issue).

This Court has previously refused to find an abuse of discretion in the trial court's exclusion of an expert witness where the trial court determined that the expert "did not have sufficient experience or familiarity in the matters in question to qualify as an expert witness." *Cordell v. Ward Sch. Bus Mfg., Inc.*, 597 S.W.2d 323, 327–28 (Tenn. Ct. App. 1980) (considering other factors in declining to find reversible error). Thus, while Mr. Bahr insists that he is familiar with the standard of care applicable in this situation, i.e., a situation involving the offering of a cut-through endorsement to a client, his claimed familiarity is supported by little more than a "bare assertion of familiarity." *Stanfield v. Neblett*, 339 S.W.3d 22, 36 (Tenn. Ct. App. 2010) ("Dr. Weiss also provided sufficient

---

[7] In his later filed declaration, Mr. Bahr clarified "that my opinions in this case as to the standard of care for an agent in Tennessee were based on my experience of being both an insurance agent and insurance consultant in Tennessee."

support for his assertion that he was familiar with the standard of care in Jackson. Like the other experts, he also did not simply make a bare assertion of familiarity without providing the court with a basis for his assertion."). Taken as a whole, it therefore appears that Mr. Bahr's qualifications for testifying specifically as to the standard of care necessary when offering a client of a cut-through endorsement are lacking. *Brown*, 181 S.W.3d at 274–75.

As previously discussed, a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. "Under the abuse of discretion standard, a trial court's ruling 'will be upheld so long as reasonable minds can disagree as to propriety of the decision made.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)). Here, reasonable minds could differ as to whether Mr. Bahr had the necessary qualifications to opine as to the standard of care necessary in a situation involving a cut-through agreement. Given Mr. Bahr's admittedly lacking familiarity with the use of cut-through endorsements, it was not unreasonable for the trial court to conclude that Mr. Bahr's standard of care opinion was "'mere speculation.'" *State v. Farner*, 66 S.W.3d 188, 208 (Tenn. 2001) (quoting *McDaniel*, 955 S.W.2d at 265).

Our decision above, however, does not end our inquiry, as we must next determine whether the trial court also correctly concluded that Mr. Bahr was unable to testify regarding the standard of care applicable when TIS offered the Highlands policy to Merit despite is B++ rating and thereafter failed to inform Merit of the drop in Highlands' financial rating in July 2001. In analyzing these remaining standard of care opinions, we must keep in mind what the trial court specifically ruled that Mr. Bahr was qualified to testify to: "(1) to what a cut through endorsement is; (2) to how cut through endorsements are used; and (3) that a B++ rated insurance company with a cut-through endorsement is not the same as an A+ rated insurance company[.]" TIS has raised no issue on appeal regarding the trial court's decision to allow Mr. Bahr to testify to these matters. As such, we take as undisputed that these matters are properly within Mr. Bahr's expertise.

Appellants contend that the trial court's decision to allow Mr. Bahr to testify that the cut-through endorsement did not alter Highlands' financial rating and yet refuse to allow Mr. Bahr to opine as to TIS' alleged failures with regard to providing Merit accurate information concerning Highlands' financial rating is illogical. Generally, a court may be found to have abused its discretion when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

We agree that the trial court's ruling appears inconsistent on this issue. Importantly, although Mr. Bahr is apparently qualified to opine that the cut-through endorsement has no effect on Highlands' financial rating, the trial court did not allow Mr. Bahr to testify that Highlands' financial rating was incorrectly explained to Merit or that TIS failed to notify Merit of the downgrade in Highlands' financial rating, both of which

- 14 -

Mr. Bahr contends are breaches of the applicable standard of care. If, however, the cut-through endorsement has no effect on Highlands' financial rating, as Mr. Bahr was allowed to opine, then Mr. Bahr's lack of expertise in this area likewise has no effect on his ability to give an opinion concerning general issues relative to financial ratings of insurance companies. Simply put, expertise regarding cut-through endorsements is not necessary to opine as to financial rating issues unless those issues are inextricably linked to the cut-through endorsement. According to Mr. Bahr's testimony, however, these issues are not inextricably linked because the cut-through endorsement did not actually do anything to alter Highlands' financial rating.

Thus, setting aside Mr. Bahr's lack of expertise in cut-through endorsements, we must conclude that Appellants have shown that Mr. Bahr has sufficient experience with general insurance matters and financial ratings to render him qualified to opine as to the remaining breaches alleged against TIS. Mr. Bahr testified in his deposition that he "constantly" deals with issues of A.M. Best ratings in his work as an insurance consultant. Moreover, Mr. Bahr testified that he has done insurance work with construction companies both as an agent, and more recently, as a consultant. Accordingly, Mr. Bahr's undisputed testimony shows that he has the necessary qualifications to opine as to these more general issues relating to financial ratings, despite his lack of experience with cut-through endorsements or the fact that he has no recent experience with the exact type of transaction at issue. *See Tire Shredders*, 15 S.W.3d at 864 (allowing a witness to testify regarding the operation of a machine even though the witness had never used the particular shredder at issue, had never used a shredder to shred the materials at issue, but the witness had considerable experience in general with shredders and had witnessed the use of the shredding machine at issue on three prior occasions). As such, the trial court abused its discretion in excluding Mr. Bahr's testimony that TIS' failure to inform Merit that Highlands was allegedly not an A rated insurance carrier in spite of the cut-through endorsement and its later failure to inform Merit of the drop in Highlands' financial rating constitute breaches of the applicable standard of care.

## II.

Appellants next contend that the trial court erred in granting summary judgment to TIS on their negligence claim. Summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts. Tenn. R. Civ. P. 56.04. This Court reviews a trial court's grant of summary judgment de novo with no presumption of correctness. *See City of Tullahoma v. Bedford Cnty.*, 938 S.W.2d 408, 412 (Tenn. 1997). In reviewing the trial court's decision, we must view all of the evidence in the light most favorable to the nonmoving party and resolve all factual inferences in the nonmoving party's favor. *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox. Cnty. Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). If the undisputed facts support only one conclusion, then

the court's summary judgment will be upheld because the moving party was entitled to judgment as a matter of law. *See **White v. Lawrence***, 975 S.W.2d 525, 529 (Tenn. 1998); ***McCall v. Wilder***, 913 S.W.2d 150, 153 (Tenn. 1995).

Here, the trial court's decision to grant summary judgment rested on the fact that Appellants were unable to provide competent expert proof establishing the standard of care and a breach thereof. Because we have concluded that the trial court improperly excluded Mr. Bahr's expert proof concerning two alleged breaches of the applicable standard of care by TIS, the record now contains the necessary expert proof on this essential element. Consequently, we vacate the trial court's decision to grant summary judgment based on insufficient expert proof of the standard of care.

## Conclusion

The judgment of the Circuit Court of Knox County is affirmed in part, reversed in part, vacated in part, and remanded to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed one-half to Appellants Joy Littleton, Grayling Littleton, and Will Allen Hildreth, and one-half to Appellee TIS Insurance Services, Inc., for all of which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE